UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 15-CV-62112-Cooke
(CASE NO. 11-CR-69159-Cooke)
Magistrate Judge P.A. White

DOUGLAS NEWTON,
    Movant,

v.

UNITED STATES,
    Respondent

FILED by _____ D.C.

NOV 3 0 2015

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S. D. of FLA. – MIAMI

## MOVANT'S REPLY TO GOVERNMENT'S RESPONSE TO MOTION TO VACATE -- SECTION 2255 PETITION

Not being an attorney, or having one to represent me, I am not certain how to appropriately reply to the government's response (October 20, 2015) to my 2255 petition (filed on October 6, 2015.)  But I do believe the following points should be make.

This case involves a reverse sting operation, originally set up and implemented as part of a jointly conceived Miami-based SEC and DOJ "initiative" designed to catch and prosecute small-time CEO's and / or promoters of penny stocks.

According to an FBI press release dated August 14, 2013, a total 153 defendants have been caught in the "initiative" to date, including persons who *"abused their knowledge of the capital markets hoping to misappropriate money held in pension fund and brokerage accounts to enrich themselves and their co-conspirators"* while using *"underhanded tactics to cheat investors and manipulate penny stocks."*

### Background

In my case, I went to trial, with my attorney, Miguel Caridad contending there was never any market manipulation or intent to harm or injure investors (just the opposite.)  I believed the evidence would show this, and also that I was entrapped by the Initiative.

However, Mr. Caridad did not raise an entrapment defense, arguing instead the essential

elements of the indictment could not be proved by the government.  He also wanted the Judge to

give a "good faith" instruction for me to the Jury, but Judge Cooke said no to this request.

During jury deliberations, one member of the jury asked the Court for a *legal definition of*

*entrapment*, but the next day -- in a decision that was unfortunate for me -- Judge Cooke

instructed the Jury they should not or could not consider "entrapment because Mr. Newton

did not raise an entrapment defense.")

What we did argue was that I did not commit the essential elements contained in the

indictment;  there was no market manipulation of my stock's value affecting any investor;

there was no financial loss incurred by others (even assuming the government's fictitious

investors actually existed);  even more important, there was no *intended* financial loss or

injury to anyone;  and no material misrepresentation made by me to anyone as well.

Before trial, I turned down a plea deal which likely would have kept me out of jail, so long

as I admitted an intention to cause a financial loss to others of $24,000.

After a short trial, and the loss of my good name and 30+ year old business,

I was found guilty on all counts (securities fraud, conspiracy to commit securities fraud,

wire fraud, mail fraud, and conspiracy to commit securities fraud with a co-conspirator,

Mr. Yan Skwara).  Judge Cooke sentenced me to 30 months in prison -- a term I began

serving at the federal Taft Correctional Institution on January 9, 2013.

### Reply to AUSA's Response Arguments

In his reply to my 2255 petition, the AUSA contends that I have no grounds for relief because

*none* of them rise to the level of a "fundamental defect" which inherently results "in a complete

miscarriage of justice."  While I believe my constitutional rights were violated -- given the way

the authorities implemented their initiative against me and scores of others -- the AUSA

obviously disagrees with this view holding that his office's reverse sting operation is a "completely acceptable federal device as long as the predisposition to commit crime is present." In a somewhat circular sounding argument, the AUSA further states that reverse stings do not violate anyone's rights "where (as here) a defendant is not entrapped by police conduct."

There are two problems with this reasoning. First, the AUSA seems to be saying a) it is a proper function of law enforcement to create and design a crime -- even an improbable one whose chances of occurring in the real world are slim to none (see p. 15-16 below) -- in order for the government to prosecute people whom it has encouraged to participate in the crime in order to obtain convictions and send people to jail; and b) it is also acceptable for government agents to launch such stings against anyone, so long as the agents can *later* show or demonstrate that the target was or might have been pre-disposed to commit such a criminal act -- whether or not the government had any actual proof of predisposition at the time the unwary target was ensnared.

Secondly, the AUSA apparently believes he has a free license to posit incriminating, false and misleading information about me, even when he had no such verified data, and to present this material to Judge Cooke as *factual*, for the purpose of influencing her thinking about me, including before and during the time when she was asked by the government to rule on my due process motion at a hearing that I was not given the opportunity to attend.

To be specific, on March 26, 2012, the AUSA wrote to Judge Cooke (DE 74) that I had an extensive history of securities fraud, had "continuously defrauded investors and deserved to become the target". But all the examples he gave the Judge, as being true and reliable, could *not possibly* have been in his possession at the time he said he was aware of same, namely before the sting effort began. It now appears the only source of these untrue, damning allegations -- at least the ones he said were in the government's possession when

they targeted me -- came from Richard Epstein, the government's informant who had already himself been caught lying to his own FBI handler (Michael Sputo) even after he was enlisted by the government to rope in as many possible targets as could be mustered for the Initiative. *
(In this same DE 74, the AUSA called me a liar and asked Judge Cooke to revoke my bond.)

Had I been permitted to attend this hearing -- which the AUSA says was on the Judge's calendar, even though it appears it was not on either the Judge's or my own lawyer's calendar -- we could have questioned the FBI Agent (Michael Sputo) whom the AUSA brought to the hearing.  We could have determined what specific information, if any, he or the prosecutor's office had in their possession, and to ask Judge Cooke to consider whether it was proper for the government to present such material as "facts" and launch their sting operation against me.

At such a hearing, we could have held the government to the AUSA's own standard, by addressing the question:  Did the pre-disposition to commit crime exist before Epstein was given the go-ahead to target me (or did he act on his own) -- over the course of weeks and months when he  asked me to spend time developing and fine-tuning a business plan for his bogus "investors" who turned out to be undercover agents "Mr. Scott" and a stereotypically-named "Mr. Russo".

While suggesting that the District Court "refused to hold a hearing" on my motion, the AUSA acknowledges that my due process motion was considered in open court. In fact, it was at this extremely short hearing that the AUSA went to great trouble to reiterate his prior claims about my bad character and  pre-disposition to commit crime.

--------------------------

* How ironic it is that during the  same time Epstein was secretly pumping and dumping stocks, engaging in real market manipulation of penny stocks, and injuring real consumers, he was at the same time supposedly helping the government stop crime, by actually manufacturing creative new crimes for targets like me to be lured to.

The AUSA further argues that the Southern District's sting initiative -- or any sting for that matter -- does *not* violate a citizen's constitutional rights, citing U.S. First Circuit Court of Appeals case law (U.S. v. Gifford 17 F. 3d 462, 471) holding that "the Executive branch is free, within broad limits, to set such snares for unwary criminals." But doesn't this language also convey that the government should not be in the business of setting snares for *non-criminals* or that the government should not spend its time and resources manufacturing carefully choreographed crimes -- designed to produce "intended loss" amounts, and other sentencing enhancement points -- which will put the target in prison for a long time whether that victim is an unwary criminal or not? Doesn't the AUSA's example of case law suggest that such snares should be limited to targeting only real or suspected criminals who have committed real crimes, or are likely to commit same?

However, in an effort to provide this Court with further "evidence" of my criminal "disposition", the AUSA now repeats the mantra to this Court that I did a "bunch of prior deals" with the government's undercover informant (Richard Epstein) . . . "probably five, six of seven prior deals." Of course, the government made this same incriminating reference to the Jury extensively during my trial, as well as here before this Court.

The reference to these six or seven separate deals came from a quote from Epstein when he secretly tape recorded me, mentioning the "deals" by number only, while not describing them in any other way. Despite the AUSA's use of this "evidence" to imply a prior criminal association with Epstein, however, the facts of the matter are very different. These "deals" consisted entirely of legal, SEC sanctioned stock purchases made by Epstein in my penny stock company via a 504 stock offering -- a type of private offering the SEC specifically approved to benefit small businesses such as mine. These stock purchases were made 3 or 4 years earlier, with each subsequent purchase made by Epstein (along with another penny-market investor friend of

5

his) who believed that more and more stock ownership in my promising company would be an excellent investment for both of them over time.

Yet, despite warranting to Judge Cooke that I was an "unwary criminal", while making up bad things about me and my 30+ year old company -- it is now obvious to me that the AUSA never consulted my SEC file --- or spoke with anyone whose name might have been listed in my FBI file, for possible exculpatory or inculpatory material -- even though former or current personnel working for the Miami SEC office played a role in the design and implementation of the sting Initiative (see press releases below). It is not a coincidence that every defendant charged criminally by DOJ was also charged in civil actions by the SEC at the identical time.

Had the SEC been consulted, my file contained copies of my company's tax returns which clearly showed that I never used the company to pay for my son's apartment expenses, or a private golf club, or home owner fees, or other damning things about me which were told to the Jury by the AUSA and by FBI Agent Sputo with great effect.

These same items were also emphasized at the government's close to the jury, and highlighted publicly after my trial when the government put out a press release -- under the heading "Other Cases Resulting from the Initiative" saying "*Newton paid $12,000 in bribes to the purported pension fund and received a total of $40,000 from the fund. The defendant used the money to pay for his golf club, home owner fees and his utilities.*" *

* I do not know to what extent this information may have influenced Judge Cooke before sentencing me to 30 months in jail -- within the guidelines based on 19 points -- even after taking 18 USC 3553 factors into account, along with letters of my good character from highly reputable people (DE 188) but do know the AUSA recommended the Judge add more enhancement points to my sentence above the 19 recommended by Probation.

Nor did the AUSA tell Judge Cooke before my trial -- or tell this Court now -- of a key quote about my prior "disposition" volunteered by my own co-conspirator, Yan Skwara when he was being secretly recorded in May 2009 by FBI agent Sputo.   In the privacy of Richard Epstein's home, Mr. Skwara stated his belief, with no prompting from anyone, that I was a very hard working, *honest* man. This unsolicited comment from Mr. Skwara about my non-criminal nature and honesty was volunteered by him *before* he was flipped by the government and agreed to testify against me at my trial, presumably in an effort to get a reduced sentence.

Nor does the government want to tell this Court, about how the FBI and Epstein engaged in efforts to ensnare me in another, *different* or second sting scheme in February of 2010. This must have been "Phase 2" of the "Securities & Investment fraud Initiative"-- wherein the SEC and / or DOJ prosecutors felt they wanted (or needed) to get more or better "goods" on me even though I had already been stung once many months before, when I agreed to pay $6,000 on two occasions to "Mr. Scott's" consulting company -- even though he told me he would do no consulting -- for the benefit of both "Mr. Scott" and "Mr. Russo".

"Phase 2" was launched at me in February 2010 -- 10 or 11 months after I was originally stung in March of 2009:  It was designed to get me to pay a $5,000 bribe through Epstein to a stock broker friend of his, via a payment to the broker's woman friend living in Miami. This would have been sufficient incentive for the broker to use money he controlled, from the brokerage accounts of several of his wealthy South American investors in Miami, to purchase stock in my company, in the open market.   Epstein said this would double the price of my stock (read market manipulation) while producing $50,000 to $75,000 cash for me, personally -- a "win, win" offer which Epstein told me I couldn't refuse.   Nevertheless it was an offer I declined to bite on, no doubt much to the dismay of the Initiative personnel back at

sting headquarters.

As to the AUSA's contention that my Third ground for relief *"fails because Mr. Newton cannot show that he suffered a 'fundamental defect' when the (District) Court refused to hold a hearing on his motion to dismiss"* I do not understand the AUSA's language here, because a hearing was held, while I was not invited to be part of it.   Furthermore, the AUSA seems to acknowledge that it took place when he says my motion was "considered in open court."   In fact, it was at this (short) hearing that the AUSA went to great trouble to reiterate his prior claims about my bad character and pre-disposition to commit crime, while reminding Judge Cooke that I already had done "6 or 7 prior deals" with Epstein.

Clearly, the transcript shows a hearing was held on my DE 67 motion on April 23, 2011.   Not being an attorney, I do not know whether it is unfair, improper or just unfortunate that I was not invited or given a chance to attend this hearing -- on only the most important motion of my life -- or whether today this does not rise to the level of being a "complete miscarriage of justice" warranting relief to me under Section 2255.

I want to state one last thing about the AUSA's response to my petition.   He tells this Court my defense attorney -- Miguel Caridad -- made a *"wise strategic"* decision not to call any witnesses on my behalf, because had he done so, this would allow the government to introduce into evidence a "plea agreement" -- which I had originally signed in January 2011 (DE 2) in which the AUSA states I *"admitted criminal liability."*   As the AUSA is wont to say, nothing could be further from the truth, or rather the whole truth and nothing but the truth.

Obviously, the AUSA is using the "plea agreement" now, in the same way he used the threat of it during my trial, as a type of Damocles sword.   At a pre-trial hearing, Judge Cooke gave the government permission to show this un-colloquied document to the Jury in the event any evidence about my *mens rea* -- or claims of my good intentions or good faith -- was brought

up by me or my defense counsel, or any of our witnesses, during the trial.

In attempting to tell this Court today why Mr. Caridad did not call an expert witness to testify on an essential element of the indictment, the AUSA speculates that I suffered no serious defects -- and my counsel was effective -- because had my attorney called such a witness, this *"would open the door to the introduction of far more harmful evidence, namely the Petitioner's own admission of guilt".* (If this is true, perhaps I should add one more ground to my petition, namely questioning Judge Cooke's pre-trial ruling concerning the terms of the admissibility of the plea document, but I have no desire to do that.)

But since the AUSA has brought it up, this Court should be allowed to see the "plea agreement" in its whole context, and not accept the characterization of the AUSA that it demonstrates my "admitted" criminal liability:  This document was signed by me on Jan. 24, 2011. on the advice of a private Miami attorney whom I hired for one day (for $2,500) who said I was not committing myself to the agreement and the terms inside it, until and unless I acknowledged before a Judge that I understood everything, and then fully admitted my guilt.

After I could no longer afford a private attorney, I gave background information about the plea document to my Federal Public Defender, Mr. Caridad.  He strongly objected to the government's proposed introduction and use of this document stating (at DE 36) "there is no evidence that the prosecutor, or anyone else for that matter, read and explained the waiver provision of this plea agreement to Mr. Newton, who was living in California, traveled to Miami and in one day met with his attorney for the first time, then with the prosecutor and was told by his counsel in effect that he had to sign the plea agreement that day or the offer it contained would be withdrawn."   In fact, within days of signing the document, after returning to my

home in California, I so notified this private attorney of my problems with the document, specifically the language about selling stock at an inflated place, and intending to bring financial harm to others. A colloquy was never scheduled or took place, either.

As to the AUSA's belief that my defense attorney made a wise, strategic decision not to call my expert witness, or any witnesses for that matter, this statement does not square with the fact that Mr. Caridad told me before trial -- and told the jury during opening comments -- that we would be calling an expert witness to show that my company's stock was *not* sold to the investors at an inflated price, and furthermore it was my understanding that Mr. Caridad would also use this witness (and even the government's own securities expert) to show how the "pensioners" would have made money -- on their $40,000 investment in my company -- had these people or their pension fund actually existed. The first half-day the trial began, Mr. Caridad told me there was a potential scheduling or travel problem with our expert witness.
He even mentioned this to Judge Cooke (out of earshot of the jury) after the first or second half-day of trial. I can understand why the government did not call its own securities expert to testify where we could cross-examine him to our advantage, but I never understood why my expert was not called.

Finally, the AUSA argues that this Court should deny "Newton's Forth Ground in which he claims that the government had an obligation to disclose materials in the SEC file" concluding that this claim -- like all the others -- fails because I "cannot show a *fundamental defect* in the proceedings" and the AUSA never had any such obligation.

It is unfortunate for me we did not get a continuance from Judge Cooke to present evidence to contradict the damning and false statements made against me by Agent Sputo. Not being able to answer these statements is just as bad -- or worse for my case in the jury's eyes -- as the fact that they were allowed to be made in the first place.

.   I ask the Court whether the prosecutor is correct now in the position he

also held at DE185 -- namely that he had no obligation to search for any Brady information

that might have served to reduce my prison sentence or impeach or contradict the testimony of

the government's own witnesses.

Yet, the AUSA continues to hold that the SEC was not part of the investigation or the

Initiative's sting enterprise, and thus it had "no constitutional duty" to search for or disclose such

information, even though the only companies targeted by FBI Agent Sputo and Richard Epstein

were SEC-reporting or SEC non-reporting penny stock companies exclusively, and all the

Initiative indictments specifically included securities law and  securities language, including

securities terms like "artificially inflated" stock price, which I was charged with on virtually

each page of my indictment.

Apparently, if the SEC had no involvement in the "investigation", or with my being

indicted on specific securities violations, the SEC certainly sought to take credit when it

made the claim that all the defendants' "schemes" (including mine) "*were brought to light by an*

*undercover operation by the FBI, conducted in such a way so that investors were not harmed.*

*The SEC worked closely with the US Attorney's Office for the Southern District of Florida and*

*the FBI on the investigation*".

The AUSA's position at DE 185 certainly seems inconsistent with this claim:

> "The government does not have to disclose information possessed by other federal or
> local agencies that are not involved in the investigation or prosecution of the case.  See
> US v. Pelullo, 399 F 3d Cir. 2005) no Brady violation regarding documents collected by
> civil branch of Dept of labor, where there was 'no indication' that the department and the
> prosecution 'engaged in a joint investigation or otherwise shared labor and resources . . . "

Conclusion

I close by citing below the reasons why I believe my due process rights -- and those of

other similar defendants -- were violated by the Southern District of Florida's sting initiative.

No one likes to be caught in a trap set by his own country, which takes away his right to life and liberty  But being 70 years old, my real interest is not to gain relief for myself at this point, but to draw attention to how unfair and damaging this sting scheme can be to the lives of people younger than me, some of whom were disposed to commit a crime, but also others who may not have been so inclined.

I hope accountability for wrong-doing will be balanced with compassion, and that pre-disposition, motivation and/or *mens rea* of defendants will always be taken into account, before more defendants are captured, to be shuffled off to prison for terms that may be longer than they and their families deserve, and a just society demands.

\*   \*   \*

---

\* March 5, 2012:  I believe the conduct of the Securities & Exchange Commission's Miami Regional Office and the U.S. Attorney's Office in Miami -- in their conception and execution of an undercover "sting" operation implemented in late 2008-early 2009 -- may have been so overreaching as to bar prosecution as a matter of due process of law, under the Fifth and Fourteenth Amendments of the US Constitution.

On these grounds, I move to dismiss complaint 11-CR-60150-Cooke

## I.  BACKGROUND

I am charged by seven (7) counts in the instant case and by the SEC with three (3) counts counts in a companion civil case -- for engaging in a fraudulent scheme of paying illegal kickbacks to a purported fiduciary of an employee pension fund so he would use the fund to purchase stock in my non-reporting publicly traded company, RLAB.

Specifically, the government contends that I paid money to a representative ("Rob Scott") of a phony consulting company in Coral Springs, FL ("Great Lakes Advisors") so he could kickback a portion of this money to the fiduciary of a pension fund (named "Benefits & Pension Group") based in New York, NY in exchange for the fiduciary's purchase of restricted shares of common stock in my company in the amount of $20,000 on March 25, 2009 and $20,000 on April 8, 2009.

In reality, the pension fund did not exist, but was presented to me as being a real live source of investment capital for RLAB.   This was communicated to me by two people:   "Scott" (actually an FBI undercover agent) and Richard Epstein, a multi-millionaire, and major investor in penny stock companies whom I had known since 2005-2006 when he invested over $100,000 in my company.

During the preceding three months (Dec. 26, 2008 to March 24, 2009) Epstein was in frequent contact with me asking that I develop and provide him with background materials needed to secure an investment of working capital for RLAB.   Unbeknownst to me, Epstein had just been arrested in Florida for

securities fraud, and part of his cooperation agreement was to help the government lure penny stock (micro-cap) companies, such as mine, to this same "source" of capital.

On March 24, 2009, Epstein asked me to travel to his home in Parkland, Florida to meet his "close business associate, Rob Scott".  Rob was purportedly an even closer friend of "Chris Russo", the name chosen by the government to impersonate the fiduciary.

## II.  QUESTIONS RAISED BY DEFENDANT

I request that Judge Cooke consider the following:

*1) Whether methods used in the SEC-DOJ-FBI sting operation constituted an unjustified intrusion into citizens' privacy and autonomy running a risk that the activity would ensnare an innocent person who was otherwise minding his own business, and who was not disposed to cross over into the commission of crime but for the government's involvement.*

*2) Were the method(s) employed by the government to ensnare the penny-stock defendants guided by a legitimate purpose -- namely to prevent crimes and protect the public -- or was the purpose to generate criminal charges insuring a prison term for as many defendants as possible?;*

*3) Did the government manufacture a crime requiring vital materials and instruments, including the "fronting" of money to each defendant, essential to the crime's commission, which the defendants could not have provided or obtained on their own?   And,*

*4) Is the criminal enterprise which the government was presumably fighting -- and/or seeking to prevent-- a real crime, or one whose chances of occurring in the real world are "slim to none" at best?*

## III. FACTORS TO WEIGH IN CONSIDERING DUE PROCESS VIOLATIONS

In his book <u>The Entrapment Defense</u> (3rd Edition) Professor Paul Marcus  writes "the rules with respect to the due process claim are difficult to state with precision . . . For many courts, the question ultimately becomes whether the government's involvement is shown to have been at a 'demonstrable level of outrageousness' or a level surpassing the limits of fundamental fairness." **(see United States v. Twigg).**

As to a definition of "outrageousness", some commentators have said "I'll know it when I see it".  Thus, trial courts look at the "totality of the circumstances" in determining if the government conduct is "so grossly shocking and so outrageous as to violate the universal sense of justice." **(United States v. Dota.)**

According to **United States v. Robinson**, among the factors to consider in evaluating a due process defense claim are: "the impetus of the scheme, the control the government exerted over the criminal enterprise, and the impact of the police activity on the commission of the crime."

The court in **United States v. Moore** discussed the problem this way:   "In determining whether police conduct has undermined constitutional due process protections, four (4) factors are considered:

    1)  the need for the type of government conduct in relationship to the criminal activity;
    2)  the pre-existence of a criminal enterprise;
    3)  the level of the direction or control of the criminal enterprise by the government;  and
    4)  the impact of the government activity to create the commission of the criminal activity."

13

The New Jersey Supreme Court stated it somewhat differently:   *"A determination of due process entrapment requires careful scrutiny of the government conduct in light of all the surrounding circumstances.   That scrutiny focuses on:*

1) whether the government or the defendant was primarily responsible for creating and planning the crime,
2) whether the government or the defendant primarily controlled and directed the commission of the crime,
3) whether objectively viewed the methods used by the government to involve the defendant in the commission of the crime were unreasonable.  And
4) whether the government had a legitimate law enforcement purpose in bringing about the crime.'*

---

*For application of the multi-factor analysis, see State v. Nelson 822 P.2d 53, 58 (Kan. 1991); United States v. Payne, 962 F.2d 1228, 1231-32 (6th Cir. 1992, cert denied, 506 U.S. 909 (1992)*

According to Ted. K. Yasuda (Note, 1982, Indiana Law Journal),  "the Third Circuit Court of Appeals' decision in **US v. Twigg** and the decision of a Third Circuit district court in **US v. Jannotti**" suggest "a more workable and reasoned approach to an entrapment due process defense than a 'shocks-the-conscience' standard."

In Twigg, ". . . the court concluded that the government's tactics would not be justified as a means of detecting crime.  Rather, the *'egregious conduct on the part of the government agents generated new crimes . . . merely for the sake of pressing criminal charges'* and the court held such "overreaching" conduct to violate due process."

Yasuda observes that "a survey of recent cases reveals numerous questionable decisions, conflicting judicial pronouncements, and a largely affective mode of analysis that bars prosecution only if the government's involvement in or solicitation of crimes is perceived as 'outrageous'".

Yasuda further writes  *". . . a due process analysis based solely on the outrageousness of the government's conduct provides no meaningful or definite standards for limiting governmental undercover activities conducted in the name of combating crime"* Thus, he recommends *" a more reasoned mode of analysis that has begun to emerge in recent decisions such as the district court's in **Jannotti**, upholding an entrapment-due process defense."*

In US v. Jannotti, a district court for the Third Circuit interpreted **Twigg** as dealing with the "central theme. . . that, though predisposed, the defendants had in fact been induced to commit a crime they would not otherwise have been likely to commit."

According to Yasuda, "avoiding the shocks-the-conscience test, the Jannotti court overturned the convictions of city councilmen Schwartz and Jannotti notwithstanding the jury's determination that the defendants had taken bribes and had been predisposed to do so.

"The entrapment due process defense which emerges from **Twigg** and **Jannotti** combines elements of both the objective and subjective theories of entrapment.  The decisions weighed numerous factors, including

1) the nature of the defendants' predisposition and its reliability as an indicator of whether the crime would have been committed absent the government's involvement;
2) the defendants' prior criminal conduct and whether the defendants had been engaged in an on-going pattern of criminal activity;

3) the initiation of the crime by the government or defendants;

4) the government's provision of essential materials or services and the likelihood that the defendants could independently have obtained them from another source;

5) the relative importance of the roles played by the government and the defendants in the offense;

6) the difficulty of detecting the crime and the need for the tactics disclosed by the case.

7) whether, objectively considered, the tactics adopted were calculated to overwhelm;  and

8) whether the record revealed  caution on the part of law enforcement officials to avoid the manufacturing of crime or disclosed simply a desire to obtain a conviction.

"No one of the above factors was determinative;  each was weighed in conjunction with the rest, the central inquiry remaining whether under the total circumstances the government's conduct was justified as limited to the detection of crime, rather than its promotion.

"The Twigg-Jannotti analysis possesses sufficient flexibility to safeguard the defendant's right to be free from government-created criminality, while respecting the real needs of law enforcement agents to resort to subterfuge to combat crime."

## IV.  POSSIBLE RELEVANT FACTORS IN THE INSTANT CASE

Following are facts, circumstances and conclusions which may warrant a further examination by Judge Cooke in considering whether due process rights have been violated:

### 1) Were the methods employed by the government to ensnare me and others guided by a legitimate purpose?

Such a purpose should have been to stop, prevent or discourage actual crimes from occurring, and to do so in order to protect the public.

In the instant case, there appears to be little or NO evidence showing the government's interest was to infiltrate an existing or on-going criminal enterprise, or that the planners sought to minimize or prevent such crimes from occurring in the future.

It appears that the criminal "activity" which the government was presumably fighting and/or seeking to prevent is actually "a crime" of which there has been very little if any instances reported in the annals of U.S. security law violations.

Few if any fiduciaries of established pension funds operating in America under ERISA rules, have been accused or convicted of taking kickbacks in exchange for their agreement to make illicit purchases of "restricted" shares of stock in a class of securities issued by a "non-reporting" public company that trades in the electronic market known as the "Pink Sheets".

Yet these were exactly the kind of entities which the Sting planners exclusively sought to target and later convict after catching them in the midst of pursuing and committing such a crime.

There are rules governing ERISA-compliant pension funds making it highly implausible for fiduciaries -- even corrupt ones -- to invest pension monies in penny-stock companies, much less "non-reporting" ones; and it is even more inconceivable the fiduciary would insist that the shares being bought from such an entity would be "restricted" shares to boot, *and* purchased at a price normally paid for "unrestricted" shares.

15

What this suggests is that the government's Sting scheme was NOT so much intended to "take a bite out of any actual crimes" being committed now, or likely to occur in the future.  Rather, it indicates that the Sting planners had as their primary purpose a different goal:  To wit, to ensnare as many officers of penny-stock companies as possible in order to produce cases and convictions for the government.

**2) Was the government's goal the creation and promotion of _new crime_, and / or based on a desire to obtain a _prison sentence_ for each CEO caught in the Sting?**

The government had the specific plan to provide the prosecution with ammunition such that each defendant would be subjected to a custodial sentence of not less than 12 to 18 months.   One of the first statements the AUSA made to my attorney in Jan. 2011, was that he wanted each defendant captured in the sting to receive "a taste of jail."

To help meet this objective, the government "fronted" each CEO with two separate wire transfers -- occurring within 14-30 days of each other -- in denominations of $20K each.   Without such cash in hand, no micro-cap CEO could commit the crime at issue: namely, paying money across state lines to the "consulting company" where some of it could then be kicked back to the corrupt fiduciary.

Phase 1 --  The size and timing of the "pension's" stock purchases were calibrated so the US Attorney could subsequently charge that the amount of the intended pecuniary harm caused by each defendant's crime would be at a sentencing level of "greater than $30,000", a specific threshold level sought by the Sting planners.

Of course, since the "pensioners" did not actually exist, and there could be no _actual_ harm inflicted on non-existent "people", the loss amount charged by the government would be defined based on the government's contention as to what was the size of the defendant's "_intended_" or potential harm.

And since the government targeted only penny-stock companies, whose stocks are by definition speculative and risky -- according to numerous warnings published on the SEC's own website and on the Pink Sheets -- the government would be on solid ground when claiming later that the pensioners whose fiduciary bought such stocks had to run a risk of losing their entire investment, or would have run such a risk in case they actually existed.

Hence, the Sting planners calculated that the size of the investors' _potential_ loss, i.e., the potential pecuniary harm -- could be as high as the identical amount paid for the stock by their pension in the first place, namely at a level _in excess_ of the government's threshold target, to wit:  "greater than $30,000".

The government's plan also featured additional specific offense characteristics designed to raise a defendant's offense level by incremental amounts.

One increase could be achieved, for example, by charging that the defendant used "sophisticated means" in the commission of the offense.  The offence level could be raised further by citing that the defendant "abused a position of public or private trust" or used a "special skill" in a manner that "significantly facilitated the commission or concealment of the offense" under 3B1.3.

These offense characteristics combined with the two individual stock purchases (over the $30,000 threshold level) would stack up the sentencing points, all but insuring a category C or D sentencing level -- and a likely prison term -- to be subsequently charged against each defendant.

Phase 2 -- Once this prison term objective was achieved, the government planners sought to escalate charges against their targets by using Epstein -- given his reputation as being an extremely wealthy and successful trader of penny stocks --  in order to proceed to Phase 2 of the government's Sting operation.

As laid out by Epstein, this consisted of a way for me to illegally create new free-trading shares of stock in RLAB in exchange for which Epstein would wire $50,000 to my bank, less 25%, or $12,000.  The smaller sum was necessary to help "incentivize" a few close broker friends of Epstein's who would begin to purchase RLAB stock in the open market "on behalf" of certain of their wealthy clients whose trading accounts were controlled by the brokers.

Unlike the stock sale to the "pension", which had no upward effect on RLAB's price in the open market, Phase 2 would have entailed actual market price manipulation, putting $38K in my hands, while artificially driving up RLAB's stock price.  Both Epstein and "Rob" said this would benefit not only my current shareholders, but the very same "pensioners" who already held $40K "worth" of RLAB stock.

Despite their best efforts, I declined to participate in Phase 2, the purpose of which was the creation and promotion of new crimes by the government.

**3) Were the Sting planners motivated  by a desire to obtain maximum publicity value for the fruits of their efforts?**

Even though I never engaged in market manipulation -- and am not being charged with same in the complaint filed by the SEC on June 30, 2011 -- the SEC saw fit to issue a national press release on the same day stating that I, along with other penny-stock CEO's, was being charged in connection with a scheme or "schemes to manipulate the volume and price of micro-cap stocks and illegally generate stock sales."

The June 30, 2011 press release also reported that the schemes "were uncovered through an FBI undercover operation" and that the U.S. Attorney's Office "today announced criminal charges against the same individuals facing SEC civil charges."

The clear impression left by this press release (see attached) has resulted in the virtual closing down of my company's retail and wholesale operations -- including the retail business I founded in 1978 (the Billy Martin's western wear store) which had operated for an uninterrupted 30 years in New York City -- to the detriment of RLAB shareholders, and suppliers and other business people whom RLAB had financially supported over the years.

**4)  Did the planners use appropriate instruments and methods in order to facilitate the likelihood that the illegal activity would occur:  Without these items, would the crimes have been possible?**

As said above, the Sting planners used an initial $20,000 to prime the pump:  To a micro-cap company,\ $20,000 was not an insignificant sum, especially in late 2008/early 2009 -- at the height of the economic downturn -- when officials at the SEC and/or DOJ targeted their sting operation against the micro-caps.In addition to this money:

a)  The government **used Epstein** to "recruit" me during the prior three month period, when I was convinced that his group of wealthy investors had been sold on RLAB and its plans to launch our new apparel line into test markets.  (The line was to be made domestically and carry the trademark "Born & Bred in the USA" which I owned exclusively and recently transferred to RLAB.)

When Epstein re-contacted me in December 2008 -- he had been a customer of RLAB's retail boutique in New York, NY for many years, and invested over $100,000 in RLAB in 2005-2006 (noted above.)

b) The government formed a **consulting company** ("Great Lakes") placing "Rob Scott" in charge of same.  They also gave "Rob" a business card saying one of his other jobs was president of the "Northern Springs Capital Group".

c) They then produced a "recommended" **consulting agreement** and sample **blank invoices** containing Great Lakes' name, for use by Rob and the micro-cap CEO.   Rob said these pro formas were the same as those signed by other penny-stock companies who had used or were using Rob's consulting company.

Even though  Rob said that initial investments from the pension started at $20,000, both he and Epstein advised that the Pension sometimes invested as much as $200,000 to $250,000 in a given penny stock company.    To begin, however, 30% of the $20,000 would need to be paid under the agreement with Great Lakes.

 d) The government produced an SEC-compliant five (5) page **subscription agreement**, from the purported Pension fund, whose name was listed as the "Benefits & Pension Group, LLC." The agreement called for my signature permitting the pension fund to immediately wire out the initial $20,000.

e)  The **purchase price** to be paid for the RLAB shares was **set by the government**.  Like the "consulting agreement", Rob said the Subscription form was already being used by the Pension for its numerous investments in other penny-stock companies, calling for the purchase of "restricted" common stock, at a price set by the government based on the closing "ask" price, as reported in the Pink Sheets, on the date the document was signed.

f) The government advised it did not matter whether the shares issued were "free trading" or **"restricted"** shares.  (The latter are shares that must be held for one year, before they can be registered for re-sale in the open market.)   Thus, the government said it did not matter if the "pension" bought "restricted" shares because pension funds generally invest their funds in stocks they tend to hold over a long period of time.

I understand now that the Subscription instrument had the two fold objective of facilitating a CEO's immediate issuance of the type of security requested by the purchaser while producing evidence for the government to charge that I sold stock to the fund at an **"inflated" price**, by virtue of the fact that the shares being purchased were "restricted".

g) On the hidden recording devices used in the sting, Rob often said he was "a mile wide and one inch deep" so don't expect him to actually do any real consulting work.

Thus, by signing the consulting agreement with "Great Lakes" and the Subscription with "Benefits & Pension Group" for "restricted stock" the government would have evidence that a phony (non-performing) consultant entity (Great Lakes) was used by me to hide kickback money ultimately intended for the pension fiduciary, "Russo", in order to induce him to illegally purchase shares of stock in a public company at inflated prices.

**5)  Does the record reveal that the government showed NO reading to prevent further crime or to protect the populace?**

 I have no idea why the government *waited* so long before informing me, in Jan. 2011 that I was "one of dozens of CEO's" caught in their sting scheme some two years earlier in March 2009.

Was it because they wanted to protect the identity of their confidential informant?   They could have found other ways to arrest me, and keep any news from spreading about their Sting, just as they had successfully kept Epstein's prior crimes secret during the time (covering a period of 16 months in total) he was working as their front man, and undercover operative.

During this "waiting" period, the government apparently did NOT consider the possibility that my small *retail* company could have issued a press release(s) disseminating news to the investing public across America that a *major national* retail *chain* (this was the purported owner of the fund) had acquired literally millions of shares of RLAB stock for their own employees and retirees of their pension fund.

I could have released this info publicly and privately at any time. It would have been big news and pushed RLAB's stock price higher.  Apparently, either the government assumed I would not release such news, or they were unconcerned, thus taking a real risk that a public company (RLAB) could disseminate untrue information, thus committing fraud on innocent people in the populace.

During this same "waiting" period, I believe the Sting planners waited to bring me in, in hopes of catching me committing bigger(?) crimes. I know they encouraged me to commit *new* crimes.  They tried this, but to no avail, in late April 2009 when Epstein and Rob proposed giving me $38,000 (in Phase 2.)

They tried again in February 2010, ten months later when Epstein offered me $50,000 via a "pump and dump" program in the open market whereby Epstein would utilize an "Hispanic friend named Julio", who purportedly controlled the trading accounts of several wealthy investors living in Miami.

**6) Did the Sting Planners follow correct procedures, governing this undercover operation under authority of the Attorney General, per 28 U.S.C. 509, 510, 533, et al., including their use of Epstein?**

There is nothing wrong with using any manner of stealth and subterfuge to stop violations or would-be violations of the law and to prevent crime;  there is nothing illegal about using an informant whom the government is compensating, in order to induce the commission of a crime.

This may be true even if the informant was Epstein, a multi-millionaire who stood to gain a "contingent fee" from the government amounting to something more valuable than money, namely a reduced prison term for his crime(s).    It is uncontested that Epstein had an enormous incentive to lure and nab penny-stock personnel to both Phases of the government's Sting program.

However, after Epstein was charged with penny-stock securities fraud in 2008, the government instructed him to refrain from any further trading in penny stocks;  he agreed to same as part of his cooperation deal.

Nevertheless, during the same time he was working to help the government locate and fight penny-stock crimes and fraud in the US -- and over an extended period of time -- Epstein continued to engage in a massive amount of penny stock trades, acquiring and most likely liquidating hundreds of millions of shares of reporting and non-reporting Penny stocks.

When confronted with this fact, Epstein originally lied to his FBI handler, but later admitted to same.

Confirmation of this was obtained by me via Discovery in the form of an affidavit and other materials (see attached) obtained from the FBI, according to which documents Epstein acknowledged producing hundreds of thousands of dollars in revenues for himself.   (Despite lying to the FBI, and committing the securities crimes for which he was charged in Dec. 2008, Epstein subsequently received a sentence of probation, and a monetary fine.)

19

Were the government's activities consistent with Attorney General guidelines governing the control and monitoring of the Sting and its undercover operations?  Did Epstein use any untrue representations to the government concerning his prior relationship with me -- or other innocent persons he was working to deliver to the Sting planners' net -- on the basis of which he targeted me, and was permitted to tape my phone conversations prior to luring me to his home in Florida on March 24, 2009?

Did Epstein provide any key service that would be reasonably unavailable to criminal actors but for the participation of the government?  I would not have spent three months preparing large amounts of materials for Epstein, or flying across country to Florida on March 24th had I not had prior confidence in him and in the truth of what he was telling me.

Extensive emails and phone calls took place during the 3-month "set up" period leading to March 24, 2009. So far, however, with my civil and criminal trials drawing near, <u>not all of these emails have been located or produced by the government, and only a few taped phone calls have been provided.</u>

## V  In Conclusion

I believe the above factors should lead this court to dismiss this indictment.

The Supreme Court, in a series of cases, has raised the possibility of a due process violation:  In Sorrells v. United States, the Court looked to the notion of "legislative intent".   At 287 U.S. 448 (1932), the majority wrote:

> "*We are unable to conclude that it was the intention of the Congress in enacting this statute that processes of detection and enforcement should be abused by the instigation by government officials of an act on the part of persons otherwise innocent in order to lure them to its commission and to punish them.*"

On the issue of "outrageousness", it is hard to understand why the pursuit and inducement of criminal conduct on the part of those not originally intending to commit a crime, especially an improbable one so totally manufactured and  orchestrated by their government with the motive being to send those people to prison, is not "outrageous."

In the New York case, **People vs. Isaacson** (406 N.Y.S. 2d. 714 (N.Y. 1978), the court dealt with what judges construed as "reprehensible police action" and began its discussion by finding that the New York state constitution imposed higher standards than those set forth by the US Supreme Court, tracing the rationale for the due process clause as follows:

> *It has been said that 'due process' unlike some legal rules is not a technical conception with a fixed content unrelated to time, place and circumstances.  It embraces fundamental rights and immutable principles of justice, and use of the term is but another way of saying that every person's right to life, liberty and property is to be accorded the shield of inherent and fundamental principles of justice . . .*

> *Due process of law guarantees respect for personal immunities "so rooted in the tradition and conscience of our people as to be ranked as fundamental." It imposes upon courts the duty to foster that fundamental fairness essential to the very concept of justice.*

<p align="center">*   *   *</p>



CUSTOMER USE ONLY

FROM: (PLEASE PRINT) PHONE ( )

NEWTON
37 LAFAYETTE DR
RANCHO MIR, CA 92270

EL 139268515 US

UNITED STATES POSTAL SERVICE® | PRIORITY ★ MAIL ★ EXPRESS™

PAYMENT BY ACCOUNT (if applicable)

USPS® Corporate Acct. No. | Federal Agency Acct. No. or Postal Service™ Acct. No.

ORIGIN (POSTAL SERVICE USE ONLY)

☒ 1-Day ☐ 2-Day ☐ Military ☐ DPO

| | | | |
|---|---|---|---|
| PO ZIP Code 92270 | Scheduled Delivery Date (MM/DD/YY) 11-10-15 | Postage $ 19.99 | |
| Date Accepted (MM/DD/YY) 11-9-15 | Scheduled Delivery Time ☐ 10:30 AM ☐ 3:00 PM ☒ 12 NOON | Insurance Fee $ | COD Fee $ |
| Time Accepted 11:44 ☒ AM ☐ PM | 10:30 AM Delivery Fee $ | Return Receipt Fee $ | Live Animal Transportation Fee $ |
| Weight ☐ Flat Rate lbs. ozs. | Sunday/Holiday Premium Fee $ | Total Postage & Fees $ 19.99 | |
| | Acceptance Employee Initials M | | |

DELIVERY OPTIONS (Customer Use Only)

☐ **SIGNATURE REQUIRED** Note: The mailer must check the "Signature Required" box if the mailer: 1) Requires the addressee's signature; OR 2) Purchases additional insurance; OR 3) Purchases COD service; OR 4) Purchases Return Receipt service. If the box is not checked, the Postal Service will leave the item in the addressee's mail receptacle or other secure location without attempting to obtain the addressee's signature on delivery.

**Delivery Options**

☐ No Saturday Delivery (delivered next business day)
☐ Sunday/Holiday Delivery Required (additional fee, where available*)
☐ 10:30 AM Delivery Required (additional fee, where available*)
*Refer to USPS.com® or local Post Office™ for availability.

TO: (PLEASE PRINT) PHONE ( )

HON. MARCIA COOKE
US DIST. JUDGE -
WILKE FERGUSON CT. HOUSE
400 N. MIAMI AVE #12-2
MIAMI - FL 33128

ZIP + 4® (U.S. ADDRESSES ONLY)

DELIVERY (POSTAL SERVICE USE ONLY)

| Delivery Attempt (MM/DD/YY) | Time | Employee Signature |
|---|---|---|
| | ☐ AM ☐ PM | |
| | ☐ AM ☐ PM | |

■ For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
■ $100.00 insurance included.

LABEL 11-B, SEPTEMBER 2015 PSN 7690-02-000-9996 2-CUSTOMER COPY

Re: 11-CR-60150

Can this document* please be filed to register my response to govt's DE 240 filed on 10/20/15?

(* sent to Judge Cooke on 11/10/15)

Thank-you - Doug NEWTON